Thank you. Good afternoon. May it please the court. My name is Victoria Hong and I represent petitioner Ibrahim Raimi. I will focus first on the credibility finding and then Kat. On credibility, the dissenting board member got it right. All three reasons that the BIA gave to find Mr. Raimi not credible are contrary to the record. First, the record does not support the BIA's finding that Mr. Raimi completely changed his story from coming to the United States because he is Christian and leaving Ghana because he is gay. At the border interview, he was asked why he left Ghana and he answered that, quote, the Muslim group chased me out of my house in the night, unquote. The border patrol officer never recorded the motives of that group. It was only the IJ who assumed that the name Muslim group referred to people with religious animosity against Mr. Raimi's Christianity. At his asylum interview and at his hearing, when he was asked who are the Muslim group, Mr. Raimi explained it is an anti-gay group. The IJ's assumption and speculation cannot support an adverse credibility finding. This is particularly true because Mr. Raimi explained that when he told the border patrol officer that the Muslim volunteers had attacked him, Mr. Raimi knew that that group was anti-gay, but the officer did not know and did not ask. The BIA's first error was not crediting the explanation given and the BIA's second error is that supplemental omissions are not contradictions. In Smolenkov, this was true at initial screening hearing and in Lai, supplemental information elicited on cross-examination did not contradict the information on direct. So supplemental omissions based on the IJ's assumptions are even more unreliable. Council, may I ask you about the statement, I'm looking at AR 203, that Mr. Raimi made in the border interview. He's asked the question about the name under which he was traveling and he said, I used that name in Ghana to travel out because I was a Muslim and I became a Christian and that was why I left the country. How do you reconcile that with the statement of the credible fear interview? Your Honor, again, at the credible fear, later at 204, he's asked the question, he's asked about his conversion to Christianity and also at 205, he's asked what's your purpose for entering the United States and he said, I came here because I have friends and they told me America's good and it's Christian but the officer never asked, why did you flee? And that why did you flee is the basis of an asylum claim and that question was never asked by the asylum officer and so when it was asked by the, excuse me, by the border patrol officer, so when it was asked by the asylum officer and the IJ, the supplemental information cannot be counted against him. Counsel, I tend to disagree with your brief and the dissenting member when you argue that when Mr. Aimi responded to the question at 204, have you received threats after becoming a Christian? Yes, I went through it when I was young. My face was sprayed with pepper. I tend to disagree with you that that isn't a response as to my face was sprayed with pepper because I was Christian. If that's the way we go, what is your other argument as to why that shouldn't be decisive? So your answer is that if you disagree with me on the credibility finding altogether, do I have any other? No, if I disagree with you as to that, I read that statement as saying, yes, I was pepper sprayed because I was Christian. Why isn't that inconsistent with other things that Mr. Aimi? Your Honor, with all due respect, I read it the same way that the dissenting about the pepper spray. Did where he was asked, have you been attacked after being Christian? And he said, yes, I was pepper sprayed in the eyes or I had hot peppers in my eyes. And he was asked, so he answered, he was attacked after becoming Christian, but he never was asked whether it was because of his Christianity or whether he was ever persecuted on his religion. When he was asked, have you ever had religious problems by the asylum officer? He said, no. So when there's a clarity and communication that was given to him, he has always been consistent with that respect that the peppers happened after, but not because. May I interrupt to ask you to talk about the significance of an omission versus inconsistency here. For instance, is it possible to be persecuted both because you're a Christian and also because you're gay? And if you give only one of those answers, meaning because of my Christianity, not also mentioning thereby omitting sexual orientation, how do you expect that that would reflect on the credibility finding? Your Honor, I would point you to Smolakova, which is an analogous case, which happened at an airport interview, which is also the initial screening interview, similar to what happened at the border. At the screening interview, the purpose is simply to ask who's the person, what's their visa, why are they coming? And Smolakova said, it is not realistic to expect a pro se person to reveal all the details of their asylum claim when they're asked about why they're coming to the country. And so supplemental information is not the basis for an adverse credibility finding. And I'd like to direct the court to 207, which are the only four questions that the border patrol asks. Under the law, they are supposed to ask, why did you leave? Do you have any fear? Are you harmed? And do you have any questions? If they meet that initial threshold, then they're referred to a trained asylum officer who sits down with them to actually look into the merits of their asylum claim to determine whether they should go forward or not. So Your Honor, I would say Smolakova is very much on point that when you're supposed to focus on just, do you have a fear? And not actually asked about the contents of the fear, the supplemental information is not the basis for adverse credibility. On the third point, on the demeanor, again, there are two ways to resolve this issue. If you agreed with me on the first two issues, there has been no prior case that has ever upheld an adverse credibility on demeanor alone. Even if you disagree with one of the points, on the traditional path, when this court upholds a demeanor finding, there's something in the record to support it. In Tsingtao, the IJ noted on the record that the person literally jumped out of their chair. On Huang, the record reported the pauses and hesitations was reported in the transcript. And even in Mainz, when the transcript not point to the exact moment in the hearing, the IJ gave vivid and specific description that the nervousness was marked by rapid speech and shaking his bracelets. Here, there's nothing to support the IJ's claim that Mr. Rahimi was visibly nervous and his answers were non-responsive. The BIA- Attorney, when you say there's nothing, the IJ says that at one point, your client seemed calmed and relaxed, but later on cross-examination, sweating. So are you saying that's not enough, that it should have been annotated as the calm and relaxed demeanor was shown versus when sweating started? Well, in Tsingtao, the answer is yes, because there, the IJ did note that on the record. And on Huang, there was also a notation in the transcript and even Mainz, where the Mainz said, it doesn't have to be a play-by-play, there has to be some specificity. And the BIA dissent noted that the claim that he was non-responsive is not found in the record at all. And every time that the IJ said he wasn't responsive, he was actually answering the questions asked. Furthermore, the direct, if you look at the transcript as a whole, the cross-examination has two points, where Mr. Rahimi has difficulty with the translator, but the direct has two points where he has problems with the translator. So that can't support the demeanor finding at all. If the court disagrees with me on demeanor, on the cat claim, even as Mr. Rahimi is not credible, there's objective evidence to prove torture. Unlike the IJ, the BIA accepted the brother's letter. And so this letter proves that Mr. Rahimi is gay, that he was harmed and he continues to face danger from the anti-gay mobs. Second, the country condition reports establish that Ghana has a law that criminalizes LGBT identity and the law attempts to coerce conformity into heterosexuality. Under Abbas, this was sufficient proof of torture, both in the extortion and the criminalization of the identity. There's also police corruption and intimidation. And when the gay men are arrested, they're subjected to sexual and physical abuse in prison. And so why don't you finish up? Your time is exhausted. Thank you, Your Honor. So even if the court disagrees on credibility, there is substantial evidence to grant the cat claim. Thank you. Thank you. Ms. Otero, whenever you're ready. Thank you, Your Honor. Good afternoon. May it please the court, Vanessa Otero on behalf of the Attorney General. Your Honors, this is a straightforward adverse credibility case that turns on the simple question of whether the agency's decision is supported by substantial evidence. And the answer is yes. The record plainly demonstrates the petitioner presented a religiously persecution claim at the border and a month later at his credible fear interview, not only disclaimed being harmed on account of his religion, but also presented a completely different claim based on his sexual orientation. Well, counsel, I mean, when you're looking at the credible fear interview, for example, at three or two, he says, my father and his siblings put peppers in my eye and they say that I don't worship. They told me that I don't, when and why? They told me that I don't go to service and I am gay. So doesn't that support that the petitioner was saying, for example, his father and his siblings put peppers in his eyes, both because he was Christian and because he was gay? Well, it may, but I think what's important to remember here is you have the agency made two different inconsistent, two different findings based on the inconsistencies he presented. Number one is the fact that as one of the judges, I'm sorry, I don't have video, so I don't know who was talking. As one of the judges pointed out at his border interview, he expressly indicated that the reason he came to the United States or rather the reason he left Ghana is because he converted from Islam to Christianity and he said, quote, that's why I came here. He also made the statement, I came to America because my friends told me it's a good place and also because I'm Christian, that's why I came. That was, and that's in contrast to what he said. Although counsel, but the question at 203 was where did you use his name in what country? And he said, I used that name in Ghana because to travel out because I was Muslim and I became a Christian and that's why I left the country. I mean, I don't read that as unambiguously say that that was the only reason he left the country so that that can be used as a finding that he was not credible. Okay, but then he furthermore, like I mentioned earlier, he also said, when asked what is your purpose for coming to the United States? He said, it's also because it's a Christian country. My friends told me America is good, that's why I came. And then why did you leave your country? The Muslim group chased me out of the house in the night. And then when asked at the end of the interview, do you have anything else to add? He said, no, he signed the statement, he initialed each page, he swore to the accuracy of his content. And I think it's important to remember sort of the chronology of what his claim is according to let's take his credible fear interview. He's stating in his credible fear interview that. If I may, if we take chronologically, this is Judge Pearson. If we take it in chronological order, shouldn't we really start with the less formal border interview? And the reason I suggest that is it seems to be the basis for the immigration judge finding that statements made later that may seem to be supplementing are inconsistent because he admitted fear due to religion at the border interview, but later expounded. So wouldn't the chronology purpose, shouldn't it start with the border interview? Yes, what I meant was more the chronology of the sequence of events of what happened to him. All right, bear with me. That's, go ahead. Our precedent pretty much establishes that adverse credibility findings cannot rest solely on asylum seekers answers, the specificity of those answers in such a less formal interview like a bond hearing or an airport interview. Shouldn't we treat the border interview as one of those same type less formal interviews? No, we shouldn't, you're up. Reason? No, no, I disagree. I think petitioner relies on Lee V. Ashcroft or rather I think the board member in her dissent did. And that's the case from 2004. And maybe that's the case that you might be referring to in which this court said that it hesitates to view statements. I'm sorry. You finish your answer, please. Okay, well, in Lee, the court said that we hesitate to view statements given during airport interviews as valuable impeachment sources because of the conditions under which they're taken. However, in that case, this court denied the PFR because there was indicia of reliability of that airport interview. And there are such indicia here. Petitioner was asked the questions with the aid of an interpreter. He said he understood the interpreter. He didn't have any questions about what was happening during the interview. He signed the statement at the end. He swore to the accuracy of its content. There can be, I mean, it's a reliable document. On top of that, government documents are... Go ahead. Go ahead, Your Honor. It looks like, Ms. Otero, that Judge Pearson's feed may have frozen. So we... No, no. Well, no, no, it's okay. I'm sure she'll come back. We will make sure that we don't take any of your time because of this. Okay. Why don't we stop the clock here if we can do that until Judge Pearson comes back. Sure. We're all facing technological challenges that we never would have thought we would have with this ago. Okay. We're working on it, Judge Bennett. Hopefully it'll be just another minute or two. Okay. All right. Thank you. Okay. Thank you. Thank you. Thank you. Thank you. Thank you. I'm sure Sam knows I need to get in there. Hello, Judge Pearson. Judge Pearson, is that you? I think we can hear you. It is. And listen, if you don't mind, Judge, I will maintain this telephone connection and participate this way. If I'm able to regain video, I'll be happy, but otherwise this should not disconnect. Okay. So why don't we put five minutes instead of four and a half minutes on the clock for Ms. Otero? And Ms. Otero, take your time, but when you're ready, why don't you start again? And we'll start the clock moving when you begin your presentation. Okay. Judge Pearson, I believe you and I were discussing the Lee case. My point with that case was- And let's start, let's thank you. We started the clock now. Go ahead. Sorry. Oh, I'm sorry. No, no, go ahead. Go ahead. All right. So the Lee case, the PFR was denied. And that's the case where this court said that it hesitated to view statements given during airport interviews as valuable impeachment sources because of the conditions under which they're taken. However, in that case, the IJ heard evidence from the immigration officer who interviewed the alien at the airport about the procedures used to ensure that the interview was accurately recorded and understood. And we have those such procedures here. I think I mentioned earlier that the airport, or rather the border interview was taken with the aid of an interpreter. But counsel, one of the things you were talking about a few minutes ago was the question that was at the border interview. What is your purpose for attempting to enter the United States? And the petitioner said, I came here because I have friends here and they told me America is good. And that is why I came. And also because it is a Christian country, that is why I came. So how is that inconsistent? How is coming to America because it's good inconsistent with the petitioner also being concerned about being persecuted because he's gay, as well as being a Christian. So how is that inconsistent with him later saying, I was persecuted because I was gay? Because he doesn't ever once mention the fact that he's gay or that he was persecuted on account of being gay at the border interview, which happened only a few months after he apparently fled his house in the middle of the night. Right, but don't we have to look at what the question is? The question is, what is your purpose for attempting to enter the United States? I came here because I have friends here and they told me America is good. How is that inconsistent with him later saying, and I was persecuted in Ghana because I was gay as well as being Christian. How's it inconsistent? It's inconsistent because he later says that he was not at all harmed or persecuted on account of his religion during his credible fear interview. I think, this is Judge Miller. The concern I have with your argument is that, there would clearly be an inconsistency if he had said, you know, by the way, I'm not gay. But he didn't say that, he just doesn't mention it. And so I think the point that some of the prior questions have gotten at is, that's really only an inconsistency if you think that the question is, the questions that were asked were questions to which, to which an answer involving his sexual orientation would have been an appropriate answer if it were true. And he wasn't, I mean, as I look at the questions that there wasn't any, there certainly wasn't anything specifically about that. And the answers are pretty terse. I guess I'm wondering where in this transcript you think that he would have said that if it were true. I mean, he could have, if you're referring to the border interview, he could have said that at any point. I don't think it necessarily, I mean, the burden of proof is on the alien. He has to present his claim to the asylum officer, to the border patrol officer, that's his burden. It's not on the asylum officer to ask a particular question. I mean, the whole point of that interview was to assess him for his fear. Why are you here in the United States? He could have said it then. I'm here in the United States. Counselor, excuse me. You also just said, you know, he didn't say anything about a problem with his being gay during his credible fear interview, but at the bottom of 301 and then up on 202, have you, do you fear harm or threat by a family member who, my father and his siblings put peppers in my eyes and they say I don't worship. Why? They told me that I don't go service and I am gay. So it's not true that he never said during his credible fear interview that he suffered no harm because he was gay and or that he suffered no harm because of his religion. He says both. I mean, he did answer. He said, have you been because of religion? He did say no, but then he says, my father and his siblings put peppers in my eye and they say I don't worship. That's true. However, he doesn't mention that. The problem is he never mentioned the fact that he's gay and that he, his whole basis of this persecution claim now is that it's a PSG based on gay men from Ghana. I'm putting words in his mouth, but that's the basis of his claim. But when he's asked, why did they put peppers in my eyes? They told me I don't go to service and I am gay, but that's a separate, that's a separate incident. From the Muslim volunteer group, who he describes as an anti-gay group. Now, there's no reason why he didn't. He hasn't ever explained why he never mentioned any of that part of his claim at the border interview when he was asked to explain the discrepancy during the Marist hearing. By the way, why did you, did you say that you were gay during the border interview? He said, yes, I told, I told the officer. He was asked that same question in different ways. Would it surprise you to find out that that interview doesn't at all mention that you're gay? And he said, well, we didn't. Counselor, your time is up. Why don't you finish your thought? The point is, is that he didn't, he presented one claim at the border. He presented a different claim based on his sexual orientation at his credible fear interview. And he disclaimed being ever persecuted on account of his religion there. I'll just close by saying that. Thanks. Thank you. Ms. Hong, you did not reserve any time for rebuttal, but we did give Ms. Otero some extra time. So if you'd like a minute, we'll put a minute on the clock for rebuttal. There's no need for you to take it if you don't want it. Thank you, your honor. I just have two quick questions to build on what you said at 299 in the credible fear interview. His first question after basically, who are you? They'd ask, why don't you come back? And he said, they will kill me. Who's they? Muslim volunteers. Is that one person or a group that is an anti-gay group? So that's at 299, he launches into the anti-gay immediately and fills out the Muslim volunteer, which is the same information he gave to the border patrol and the border patrol officer never followed up with, who are they? The second point I'd like to make is that Abbas provides the remedy that I'm asking for as well. In Abbas, it was by a gay man from Ghana who was persecuted or who faces the same anti-gay law that Mr. Rahimi does. The court there found that to be future torture, granted the cat claim and remanded the asylum and withholding claim after correcting those errors. I'm respectively asking the same situation to be here for Mr. Rahimi, who's also a gay man subject under the same law that this court had found to be torture. All right, thank you. We thank counsel for their helpful arguments and this case will be submitted. The next case is Ortiz-Alfaro v. Barr. Ms. Hallegren and Mr. Hogan, are you ready to proceed?
judges: Pearson, Bennett, Miller